**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **PERVIE HENDERSON,** | * | |
| | * | |
| **Plaintiff** | * | |
| | * | |
| **v.** | * | **Civil No. JFM 06-cv-1284** |
| | * | |
| **JOHN GILBERT, ET. AL.,** | * | |
| | * | |
| **Defendants.** | * | |
| | * | |
| | ***** | |

**MEMORANDUM**

Pervie Henderson has brought this *pro se* employment discrimination action against

Defendants Anne Arundel County Board of Education ("the Board"); John Gilbert, the foreman of

operations for Anne Arundel County Schools; Walter George, the supervisor of operations for the

Anne Arundel County Schools; and Sue Torr, who served as principal of Solley Elementary School

("Solley") during much of the time relevant to this action. Upon motion of the defendants, I

previously dismissed some of the claims asserted by Henderson.  Discovery has now been

completed, and defendants have filed a motion for summary judgment as to the remaining claims.[1]

Henderson has responded to the motion.  The motion will be granted.

### I.  Facts

---

[1]The remaining claims are as follows:
     Count I -- alleged violation of Article 24 of the Maryland Declaration of Rights by all defendants;
     Count III -- alleged violations of Title VII by the Board; and
     Count IV -- alleged federal constitutional violations by the individual defendants asserted under 42 U.S.C.  1983 and 1985(3).

Henderson is a fifty-three-year-old African-American male. (Pl.'s Opp. to Defs.' Summ. J. Mot. at 2.) Since October 1995, Henderson has been employed by the Board's Operations Division, which is primarily made up of custodial staff. (Defs.' Mot. for Summ. J. at 2.) In December 1997 Henderson was promoted to Lead Custodian and in February 1999 was promoted to Chief Custodian. (*Id.*, Ex. 1, Reese Aff. ¶ 17.) In September 2003 he was administratively transferred to Solley to be the Chief Custodian at that school. (*Id.*) Prior to his transfer, Henderson had in April 2003 applied for and not been offered a promotion to be a Lead Boiler Maintenance Technician at Solley. The instant action arises from the denial of the promotion and from suspensions imposed on Henderson while he was employed as the Chief Custodian at Solley on three separate occasions: June 2, 2004; August 24, 2004; and February 14, 2005. (*Id.*, Henderson Dep., Exs. 2, 6, 8.)

Henderson alleges that he was discriminated against because of his race, in particular that he was punished more severely for poor job performance issues than similarly situated Caucasian employees. (Compl. ¶ 13.) He also alleges, with regard to incidents that took place after he filed his first charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Maryland Commission on Human Relations, that defendants retaliated against him with further punishment for the exercise of his statutory rights. (*Id.* ¶ 24.)

## II.  Title VII Claims Against the Board (Count III)

*A. June 2004 Suspension*

The Fourth Circuit has identified three factors that a plaintiff must demonstrate in order to establish a prima facie case of racial discrimination under Title VII associated with employee discipline actions. Specifically, a plaintiff must show "(1) that he is a member of the class protected by Title VII, (2) that the prohibited conduct in which he engaged was comparable in seriousness to misconduct of employees outside the protected class, and (3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees." *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993). If the plaintiff successfully establishes a prima facie case, then the burden shifts to the employer to provide a "non-discriminatory reason for the disciplinary enforcement." *Id*. If the employer provides such a reason, the burden shifts back to the plaintiff to "demonstrate that the employer's reasons are not true but instead serve as a pretext for discrimination." *Id*. Throughout this process, the plaintiff bears the final burden of proving intentional discrimination against him by the employer. *Id*.

The Board argues that Henderson's race discrimination claim with respect to the June 2004 suspension should fail because he is not able to establish a prima facie case. (Defs.' Mot. for Summ. J. at 20.) In the alternative, the Board argues that even if I could find that Henderson had established a prima facie case, his race discrimination case should fail because defendants have demonstrated, through evidence presented in the record, that there was a legitimate basis for the discipline that Henderson received and Henderson is not able to show pretext. (*Id*. at 21.)

3

Henderson indeed has not been able to establish a prima facie case for race discrimination because he has not been able to identify any employee of Solley – or the Board more broadly – who had similar work performance issues but received less severe discipline. As stated in the June 1, 2004 suspension letter that Henderson received, he was placed on suspension for alleged "insubordination, misconduct and neglect of duty." (Pl.'s Opp. to Defs.' Summ. J. Mot., Ex. 4 at 1 (June 1, 2004 letter of suspension).)  His suspension was based on three separate incidents. The first incident involved the pulling of the school fire alarm before being requested to do so by office staff despite a written directive from the Solley principal. (*Id.*)[2] The second incident involved failing to remove a dead hamster from a cage and informing school staff in an "offensive" manner that this was a job for animal control. (Pl.'s Opp. to Defs.' Summ. J. Mot., Ex. 4 at 1 (June 1, 2004 letter of suspension).)[3] The third incident involved the failure of Henderson to provide the Solley principal with a written response to questions as to how he handled the removal of the dead hamster, which Henderson maintains was unnecessary given his verbal responses. (Pl.'s Opp. to Defs.' Summ. J. Mot., Ex.14 at 1 (Oct. 15, 2005 Letter from Henderson to Md. Commission on Human Relations).)

Henderson has not provided evidence that "the prohibited conduct in which he engaged was

---

[2] Henderson has maintained that he was given such a request. (Pl.'s Opp. to Defs.' Summ. J. Mot., Ex.14 at 1 (Oct. 15, 2005 Letter from Henderson to Md. Commission on Human Relations).)

[3] Henderson was later found not to have violated a work requirement in failing to remove the dead hamster, but was found to be unduly rude in the manner in which he informed school staff to contact animal control. (Defs.' Reply to Pl.'s Opp. to Defs.' Mot. for Summ. J., Ex. 2 at 2 (July 30, 2004 Letter from Director of Employee Relations of Anne Arundel County Public Schools) ("Mr. Henderson's demeanor and manner regarding the disposal of the dead animal while unprofessional and not in keeping with the expectations of conduct for Chief Custodians, did not involve a neglect of duty.").)

comparable in seriousness to misconduct of employees outside the protected class" or that "the disciplinary measures enforced against him were more severe than those enforced against those other employees." *Cook*, 988 F.2d at 511. During his deposition, Henderson made reference to another Chief Custodian employed by the Board, Karen Wagner, whom he believed had pulled a fire alarm before being given permission to do so but had not been punished to the extent that he was. (Defs.' Mot. for Summ. J., Ex. 5, Henderson Dep. 68:17-71:21.) Henderson had also referred to Wagner in a letter written to the Maryland Commission on Human Relations as being a "Caucasian and [holding] a position as Chief Custodian" employed by the Board. (Pl.'s Opp. to Defs.' Summ. J. Mot., Ex.14 at 1 (Oct. 15, 2005 Letter from Henderson to Md. Commission on Human Relations).) However, when asked specifically if he knew how Wagner was disciplined, Henderson replied, "I don't know." (Defs.' Mot. for Summ. J., Ex. 5, Henderson Dep. 70:8.) Further, when asked specifically during his deposition if he knew whether Wagner had even pulled a fire alarm, Henderson replied, "I don't know when or what, you know." (Defs.' Mot. for Summ. J., Ex. 5, Henderson Dep. 71:12.) Even if it was the case that Wagner did pull the fire alarm as Henderson alleges, he was disciplined for more than the pulling of the fire alarm – namely, the handling of the dead hamster and the failure to provide a written response to questions posed by the Solley principal. These additional incidents differentiate the scope and nature of Henderson's actions from Wagner's.

Henderson also alleges that another Caucasian employee, Ken Cavey, was not severely punished for allowing boilers to go "down." (Defs.' Mot. for Summ. J., Ex. 5, Henderson Dep. 141:8-142:15.) However, when asked to explain what the infraction was exactly and how Cavey was disciplined, Henderson replied, "Something went down, and they didn't do anything to him that

normally they would do. He didn't have the equipment ready. I can't exactly know exactly what it was." (Defs.' Mot. for Summ. J., Ex. 5, Henderson Dep. 142:5-8.)

Henderson also suggests that generally there were disparities in punishment between Caucasian and African-American employees of the Board.  He specifically refers to another African American employee of the Board, Pearl Gross, alleging that she was punished for being excessively late. (Defs.' Mot. for Summ. J., Ex. 5, Henderson Dep. 143:15-144:19.) However, when asked to explain how he knew about the situation with Gross, Henderson replied that he did not know about it firsthand, but rather overheard his supervisor, Gilbert, talk about disciplining Gross without getting into specific detail, saying "John Gilbert came in and was disciplining her. And he was kind of like talking about it, but he wasn't talking about it. . . And he said something that, you know, he's not going to talk about; but he had disciplined her." (Defs.' Mot. for Summ. J., Ex. 5, Henderson Dep. 144:13-18.)

Moreover, the evidence in the record contradicts Henderson's assertion of punishment disparities among members of different races. A review of the personnel files of the Operations Division conducted by Robert Reese, an Operations Specialist who reports directly to Walter George, reveals that from January 2003 through December 2005, seven Chief Custodians – not including Henderson – were suspended without pay. (Defs.' Summ. J. Mot., Ex. 1, Reese Aff. ¶ 20.) Notably, five of those who were suspended were white and two were black and there is no discernable evidence of African-Americans receiving more severe punishment than Caucasians for poor work performance. (Defs.' Reply to Pl.'s Opp. to Defs.' Mot. for Summ. J., Second Reese Aff.

¶¶ 2-5 (providing reasons behind the suspensions, which include insubordination, inappropriate contact with a minor, keeping inaccurate timesheets, and violation of the Board's drug/alcohol policy).)

At best, Henderson has succeeded in alleging "drastic displays of control and use of authority" but he has not made a case for racial discrimination. (Pl.'s Opp. to Defs.' Summ. J. Mot., Ex.14 at 1 (Oct. 15, 2005 Letter from Henderson to Md. Commission on Human Relations).) Henderson in his opposition to defendants' summary judgment motion repeatedly argues that in his actions he was merely following proper procedure in keeping with his job description.[4] As supposed proof of his proper job performance, Henderson cites his May 14, 2004 performance appraisal and includes it as an exhibit in his opposition. (Pl.'s Opp. to Defs.' Summ. J. Mot., Ex. 1.) Although the performance appraisal does have the second highest "Meets Standards" box checked with the accompanying description that Henderson "[s]atisfactorily met the requirements and expected results for the job" and he demonstrated "[g]ood performance" overall, in the comments section the Solley principal appraising his performance offered the following constructive criticism:

> Mr. Henderson is dependable. Although he responds promptly to requests from the administration, he is encouraged to keep in mind that holding the position of Chief requires ensuring positive interactions with all staff members. Striving to communicate in a positive manner will enhance working relationships.

*Id.*

---

[4] *See, e.g.*, Pl.'s Opp. to Defs.' Summ. J. Mot. at 22 ("That the white female was allegedly upset that a black subservient male, such as Mr. Henderson, would obey County procedure instead of feigning ignorance of the appropriate procedure is a clear reflection of her racist expectations.") (referring to Henderson's refusal to sign for a mail delivery to the Solley music teacher).

In sum, Henderson was suspended as a result of various written reports about his professional misconduct related to the fire alarm pulling, the dead hamster, and the failure to provide written responses to questions from the Solley principal. (Defs.' Summ. J. Mot., Ex. 2, Attachments A(1)-(3).) Though Henderson may challenge the truth of these reports and the actual facts that surround them, he does not challenge the material fact that the reports were made to George, the Supervisor of Operations, and George suspended Henderson upon determining that the reports possessed enough credibility to warrant suspension. Accordingly,  there is insufficient evidence in the record to support Henderson's claim that racial discrimination played a role in the June 2004 suspension or that there was a non-legitimate pretext for the suspension.[5]

## B.  August 2004 and February 2005 Suspensions

Henderson was suspended again in August 2004 and February 2005. He alleges that these suspensions were retaliatory measures ensuing after Henderson filed his first charge of discrimination with the EEOC and the Maryland Commission on Human Relations. (Compl. ¶ 24.) To make a prima facie case for retaliation, a plaintiff must show that "(1) the employee engaged in protected activity, (2) the employer took adverse employment action against the employee, and (3) a causal connection existed between the protected activity and the adverse action." *Munday v. Waste Mgmt. of N. Am., Inc.*, 126 F.3d 239, 242 (4th Cir.1997) (quoting *Ross v. Comm. Satellite Corp.*, 754 F.2d 355, 365 (4th Cir.1985)). After a prima facie case has been established, the defendant must

---

[5]

Even assuming that I were to accept that Henderson has made out a prima facie case for racial discrimination, Henderson had not been able to demonstrate that the reasons the Board has given for suspending him are a pretext for racial discrimination.

provide a legitimate non-discriminatory reason for the adverse employment action, and if the defendant does this successfully, the plaintiff then bears the burden of showing that the reason provided by the defendant is pretextual. (*Id.*)

The Board concedes that Henderson has established a prima facie case for retaliation but argues that it is entitled to summary judgment as to the claims based upon the August 2004 and February 2005 suspensions because the reasons provided for those suspensions were legitimate and non-discriminatory. (Defs.' Summ. J. Mot. at 2.)

Henderson's August 2004 and February 2005 suspensions were premised on several reports of misconduct. Henderson was suspended in August 2004 in part for refusing a Solley teacher access to the school building to use the computers before the school was open for the academic school year, informing her that the school was closed when it in fact was not. (Defs.' Summ. J. Mot., Ex. 2, Torr Aff., Attachment (B)(1); Ex. 6, Duncan Aff. ¶ 4.) The August 2004 suspension also stemmed from an interaction between Henderson and the physical education teacher of Solley in which Henderson allegedly reluctantly and argumentatively assisted the teacher with preparing the school gymnasium for a demonstration for the Board and other teachers, even though the teacher had secured an administrative approval for the use of the school gymnasium that Henderson had signed off on. (Defs.' Summ. J. Mot., Ex. 2, Torr Aff., Attachment (B)(2) at 3.)

The February 2005 suspension was precipitated by similar incidents and the suspension itself was based on an alleged "continuing pattern of misconduct to include a willful failure to cooperate

9

with the administration, faculty and staff at Solley Elementary School." (Pl.'s Opp. to Defs.' Summ.

J. Mot., Ex. 7 at 1 (February 11, 2005 letter of suspension).) This included allegedly refusing to

accept deliveries to the school addressed to the music teacher and various incidences of rude

behavior towards school staff. (*Id*. at 1-2.) One of the suspension factors cited in the suspension

letter was a January 31, 2005 letter to George, the Supervisor of Operations, written by Buddemeier,

the chairperson of the Solley Faculty Advisory Council. (*Id*. at 1.) Buddemeier, in the letter written

on behalf of the council, voiced the council's "continual concerns regarding Mr. Henderson."

(Defs.' Summ. J. Mot., Ex. 7, Buddemeier Aff. ¶ 4.) Rather than appear retaliatory in nature –

Buddemeier was the physical education teacher to whom Henderson had rudely assisted prior to his

August 2004 suspension – the letter stresses primarily that "[c]ommunication between the faculty,

administration and custodial staff is imperative for a positive and safe climate" and is signed by five

faculty members in addition to Buddemeier. (*Id*.) [6]

Henderson, in his opposition to defendants' summary judgment motion, states that "[t]he

items for which Henderson was disciplined were trivial and pretextual." (Pl.'s Opp. to Defs.' Summ.

J. Mot. at 14 (#18).) However, this bare assertion does not withstand scrutiny or present a dispute

---

[6] Henderson in his opposition appears to argue that pretext is shown by the efforts the Solley principal, Torr, took to collect and date written reports of his alleged misconduct. (*See, e.g.*, Pl.'s Opp. to Defs.' Summ. J. Mot. at 21 (#60) ("The six female [C]aucasian teachers of the 'Faculty Advisory Council' were solicited by Defendant Torr to record all complaints about Mr. Henderson, thus inciting a 'pile on'.").) However, I agree with Defendants that for a school official to ask for complaints to be put in writing "shows nothing more than prudent managerial practice . . . it establishes that the reports were actually received. It is not evidence of pretext." (Defs.' Reply to Pl.'s Opp. to Defs.' Mot. for Summ. J. at 10.) Furthermore, it is worth noting that at the time the Solley Faculty Advisory Council submitted its letter of complaint to George in January 2005, Torr had as of December 2004 already left her position as the school principal of Solley for a promotion to be Assistant to the Superintendent for Reading, reporting directly to the Board. (Defs.' Summ. J. Mot., Ex. 2, Torr Aff. ¶ 30.)

of material fact since the record presented substantiates that defendants did have multiple legitimate and non-discriminatory reasons for suspending Henderson in August 2004 and February 2005 that do not reveal any apparent pretext of underlying retaliatory motives.

### III.  Maryland Constitutional Claim Against All Defendants (Count I)

This claim fails for the same reasons as does Henderson's Title VII claims against the Board that I have already discussed.  Moreover, the individual defendants have also asserted a statutory qualified immunity defense that is fully supported by the record.

Section 5-518(e) of the Courts and Judicial Proceedings Article of the Maryland Code provides: "A county board employee acting within the scope of employment, without malice and gross negligence, is not personally liable for damages resulting from a tortious act or omission for which a limitation of liability is provided for the county board[.]" Md. Code Ann., Cts. & Jud. Proc. § 5-518(e) (West 2006). "Malice is established by proof that the defendant[ ] 'intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff.'" *Lovelace v. Anderson*, 730 A.2d 774, 788 (Md. 1999) (quoting *Davis v. DiPino*, 637 A.2d 475, 479 (Md. 1994) (rev'd on other grounds, 655 A.2d 401 (Md. 1995)).

Here, the record establishes the following facts:

(1) Torr and Gilbert acted in response to written reports from faculty and staff regarding Henderson's work behavior (Defs.' Summ. J. Mot., Ex. 2, Torr Aff., Attachment (B)(1)-(2); *Id.*, Ex. 4, George Aff., Attachments A-F.);

(2) Torr offered positive commentary in her performance appraisal of Henderson in May 2004 in addition to commentary that he work to improve his interpersonal professional communication skills and was no longer principal of Solley in January and February 2005 and could therefore not act on Henderson's alleged suspension-worthy misconduct (Pl.'s Opp. to Defs.' Summ. J. Mot., Ex. 1.);

(3) George suspended Henderson in response to written complaints, interviews with faculty and staff, and reviews of other school records (Defs.' Summ. J. Mot., Ex. 4, George Aff., Attachments A-F.);

and

(4) George also approved the transfer of Henderson from Solley to a Preventative Maintenance Technician position that Henderson described as a "step up, because that's the highest of [the] whole division" in terms of a custodial position within Operations. (Pl.'s Opp. to Defs.' Summ. J. Mot., Ex.15, Henderson Dep. 13:2-3.)

These facts establish that the individual defendants did not act with malice or gross negligence.  Henderson has been able to cite to no other evidence that would establish the contrary.

## IV.  Federal Constitutional Claims Against Individual Defendants (Count IV)

### A.

In an employment discrimination action the same elements are needed to establish a prima facie case as to a federal constitutional claim as are needed to establish a Title VII claim.  *Gairola v. Virginia Dep't of Gen. Servs.*, 753 F.2d 1281, 1285 (4th Cir. 1985). Therefore, the individual defendants are entitled to summary judgment on the federal

constitutional claims asserted against them under sections 1983 and 1985(3) based upon Henderson's suspensions  for the same reasons that the Board is entitled to summary judgment for the similar claims asserted against it under Title VII.

## B.

Henderson also asserts federal constitutional claims against George and Gilbert in connection with his failure to be promoted to the position of Lead Boiler Maintenance Technician.  George and Gilbert seek summary judgment as to that claim on the ground that the evidence establishes that they could not have prevented Henderson from being appointed to Lead Boiler Maintenance Technician.

As defendants contend, the summary judgment record demonstrates that (1) Gilbert was not Henderson's supervisor at the time that Henderson applied for the promotion in April 2003 and was not involved in the selection process for the position; and (2) George did not receive Henderson's name as a recommended candidate for the position. (Defs.' Mot. for Summ. J. at 2.)  According to the record, at the time that Henderson applied for the Lead Boiler Maintenance Technician position, Diane Gerlowski was serving as the head of the Energy Management Section with the Operations Division and was the manager in charge of hiring for the position to which Henderson applied. (Defs.' Mot. for Summ. J., Ex. 8, Gerlowski Aff. ¶ 2.) In her affidavit, Gerlowski affirms that as part of the interview process for the position she received a list from the personnel division and interviewed all of the

persons on the list, and the person who received the highest score during the interviews was selected for the position, Daniel Endley. (*Id*. ¶¶ 4-5.) Henderson's name was on that list, which had a total of eight names, including that of Endley. (*Id.*, Attachment 1 ("Candidates for the Lead Boiler Maintenance Technician Position".) Gerlowski affirms that Endley declined the offer of the position, and the person who had formerly held the position, Larry Pumphrey, who had transferred to a Complex Engineer position, "decided to come back to his former position as Lead Boiler Maintenance [Technician,] which he [was] allowed to do." (*Id*. ¶ 6.) Thus, according to Gerlowski, "the selection process was not resumed with other applicants because Pumphrey resumed his prior position." (*Id*.)

These facts clearly establish that George and Gilbert did not play a role in the decision-making process leading to Henderson's non-selection as a Lead Boiler Maintenance Technician.  Therefore, they are entitled to summary judgement as to Henderson's failure to promote claim.

A separate order effecting the rulings made in this memorandum is being entered herewith.

Date: <u>February 20, 2007</u>                    <u>/s/                                        </u>
                                                                        J. Frederick Motz
                                                                        United States District Judge

14